IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CELLECTIS S.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 11-173-SLR |
| | ) |
| PRECISION BIOSCIENCES, INC., | ) |
| | ) |
| Defendant. | ) |

Chad M. Shandler, Esquire of Richards, Layton & Finger LLP. Counsel for Plaintiff. Of Counsel: Richard L. DeLucia, Esquire, Paul M. Richter, Jr., Esquire, and Anne Elise Herold Li, Esquire of Kenyon & Kenyon LLP.

Richard L. Horwitz, Esquire and David E. Moore, Esquire of Potter Anderson & Corroon LLP, Counsel for Defendant. Of Counsel: David B. Bassett, Esquire, Vinita Ferrera, Esquire, and Allen C. Nunnally, Esquire of Wilmer Cutler Pickering Hale and Dorr LLP.

**MEMORANDUM OPINION**

Dated: May 3, 2012
Wilmington, Delaware

*[signature]*
**ROBINSON, District Judge**

## I. INTRODUCTION

Pending before the court are various motions filed by the parties to this business dispute. Plaintiff Cellectis, S.A. ("Cellectis") has moved to enjoin certain litigation filed by defendant Precision Biosciences, Inc. ("Precision") against Cellectis in North Carolina, and Precision has moved to transfer the above captioned litigation to North Carolina or, in the alternative, to stay the litigation pending reexamination of the patent in suit. (D.I. 7, 16) The court has jurisdiction to hear these motions pursuant to 28 U.S.C. § 1338. Venue is appropriate pursuant to 28 U.S.C. § 1400(b). For the reasons that follow, the court grants Cellectis' motion to enjoin and denies Precision's motion to transfer.

## II. BACKGROUND

### A. The Parties

Cellectis is a publicly-traded biotechnology company in the field of genome engineering, particularly in the use of meganucleases as innovative tools to enable targeted modifications to DNA. Cellectis was founded in 1999 (D.I. 8 at 2) and, although incorporated and headquartered in France, it "has business relationships with companies all over the U.S. and throughout the world." (D.I. 23 at 4; *see also* D.I. 1 at ¶ 1)

Precision is a privately-held biotechnology company that also has as its focus the development and commercialization of engineered endonucleases. It was founded in 2006 and is a Delaware corporation with its principal place of business in North Carolina. (D.I. 1 at ¶ 2; D.I. 10 at ¶ 2; D.I. 8 at 2)

## B. The Parties' Litigation History

In March of 2008, Cellectis sued Precision in the United States District Court for the Eastern District of North Carolina for infringement of U.S. Patent Nos. 6,610,545 ("the '545 patent") and 7,309,605 ("the '605 patent"). *See Cellectis S.A. v. Precision BioSciences, Inc.,* Civ. No. 5:08-119-H (E.D.N.C.) (*"North Carolina I"*). The '545 and '605 patents each issued from an application first filed by Institut Pasteur in 1992. Subsequent to the initiation of suit, Precision requested, and was granted, *inter partes* reexamination of the '545 and '605 patents. Precision filed a motion to stay *North Carolina I*, which motion was granted in August 2010 at the close of fact discovery. (D.I. 23 at 6) The United States Patent and Trademark Office ("PTO") has since rejected the claims of the '545 and '605 patents and an appeal is currently pending before the Board of Patent Appeals and Interferences.

On March 1, 2011 at 5:59 a.m., as soon as U.S. Patent No. 7,897,372 ("the '372 patent") issued and was publicly available from the PTO's website, Cellectis filed the instant litigation against Precision for infringement of the '372 patent.[1] Later that same day, Precision filed a declaratory judgment action on the '372 patent in North Carolina (*"North Carolina II"*). Precision has filed its answer to the amended complaint in the instant litigation, and a scheduling order has been approved by the court. (D.I. 27, 33)

---

[1] Previously, on November 30, 2010, Cellectis filed an action for infringement of U.S. Patent No. 7,842,489 ("the '489 patent") against Precision in this court. (Civ. No. 10-1033-SLR) On December 6, 2010, Precision filed a declaratory judgment action in the Eastern District of North Carolina regarding the '489 patent. The parties have since resolved both cases by stipulation filed on October 28, 2011. (Civ. No. 10-1033, D.I. 57)

## III. STANDARD OF REVIEW

Since the Act of 1897, when Congress first enacted what is now 28 U.S.C. § 1400(b),[2] any civil action for patent infringement could be brought in the judicial district in which the defendant was incorporated. Indeed, until 1990, the words "inhabitant" (used prior to 1948) and "resident" (used since 1948), as those words relate to corporate venue in patent infringement cases, were limited to "the state of incorporation only." *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 226 (1957); *see also VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574,1578 (Fed. Cir.1990). In 1990, the Federal Circuit in *VE Holding* interpreted the 1988 amendment to the general venue statute, 28 U.S.C. § 1391(c), as supplementing the specific provisions of § 1400(b). More specifically, § 1391 was amended to broaden the general venue provision for corporations:[3]

> (c) **For purposes of venue under this chapter,** a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.

(emphasis added) The Federal Circuit held that the emphasized language above

---

[2]Section 1400(b) provides:

> (b) Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.

[3]Before the 1988 amendment, § 1391(c) provided:

> (c) A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes.

3

clearly indicated that § 1391(c), on its face, applied to § 1400(b), "and thus redefine[d] the meaning of the term 'resides' in that section." 917 F.2d at 1578. Thus, as recognized by the Federal Circuit, "[v]enue, which connotes locality, serves the purpose of protecting a defendant from the inconvenience of having to defend an action in a trial court that is either remote from the defendant's residence or from the place where the acts underlying the controversy occurred. . . . The venue statutes achieve this by limiting a plaintiff's choice of forum to only certain courts from among all those which might otherwise acquire personal jurisdiction over the defendant." *Id.* at 1576 (citation omitted).

Since 1948, 28 U.S.C. § 1404(a) has given district courts the authority to "transfer any civil action to any other district or division where it might have been brought." According to the Supreme Court, § 1404(a) "reflects an increased desire to have federal civil suits tried in the federal system at the place called for in the particular case by considerations of convenience and justice. Thus . . ., the purpose of the section is to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense . . . .' To this end, it empowers a district court to transfer 'any civil action' to another district court if the transfer is warranted by the convenience of parties and witnesses and promotes the interest of justice." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quoting *Continental Grain Co. v. Barge F.B.L.-585*, 364 U.S. 19, 26-27 (1069)). The Supreme Court has urged a "common-sense approach" to application of the statute, as it was designed as a "federal judicial housekeeping measure, dealing with the placement of litigation in the federal courts and generally intended, on the basis of convenience and

fairness, simply to authorize a change of courtrooms." *Id.* at 623, 636-37.  *See also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981).  Consistent with Federal Circuit precedent characterizing motions to transfer pursuant to § 1404(a) as procedural matters, the law of the regional circuit provides the governing standards. *In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1222-23 (Fed. Cir. 2011); *see also gen. Panduit Corp. v. All States Plastic Mfg. Co., Inc.*, 744 F.2d 1564, 1575 (Fed. Cir. 1984) ("When we review procedural matters that do not pertain to patent issues, we sit as if we were the particular regional circuit court where appeals from the district court we are reviewing would normally lie.  We would adjudicate the rights of the parties in accordance with the applicable regional circuit law.").

Consistent with the Supreme Court's jurisprudence, "§ 1404(a) accords broad discretion to district court[s]" and "directs [such courts] to take account of factors other than those that bear solely on the parties' private ordering of their affairs.  [A] district court also must weigh in the balance the convenience of the witnesses and those public interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of the 'interest of justice.'" *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 30 (1988).  Likewise, the United States Court of Appeals for the Third Circuit has directed district courts to consider "many variants of the private and public interests protected by the language of § 1404(a)." *Jumara v. State Farm Insurance Co.*, 55 F.3d 873, 879 (3d Cir. 1995).

As can be seen, by the time *Jumara* issued in 1995, there was a recognized historical continuum that served as the backdrop for the Third Circuit's analysis.  First, a

defendant's state of incorporation had always been a predictable, legitimate venue for bringing suit. Second, a plaintiff, as the injured party, generally had been "accorded [the] privilege of bringing an action where he chooses." *Norwood v. Kirkpatrick,* 349 U.S. 29, 31 (1955). Indeed, although it was recognized at the time that the enactment of § 1404(a) permitted judges to exercise broader discretion than had been the case under the common law doctrine of *forum non conveniens*,[4] the risk associated with the exercise of such discretion was also recognized, as described in the dissenting opinion in *Norwood* as "assigning to the trial judge the choice of forums, a prerogative which has previously rested with the plaintiff." *Id.* at 37 (Justice Clark, with whom Chief Justice Warren and Justice Douglas concurred, dissenting where the trial judge transferred three personal injury suits from Pennsylvania, where the plaintiffs resided, to South Carolina, the forum of choice for the defendant employer).

In *Jumara*, the Third Circuit establishes the analytical framework for the resolution of the instant motion to transfer. The Court starts its analysis by reminding the reader that "[t]he burden of establishing the need for transfer . . . rests with the movant" and that, "'in ruling on defendants' motion, the plaintiff's choice of venue should not be lightly disturbed.'" *Id.* (citation omitted). *See generally, Van Dusen,* 376 U.S. at 635 (where the Supreme Court refers to "the plaintiff's venue privilege"). The Third Circuit recognizes that,

> [i]n ruling on § 1404(a) motions, courts have not limited their

---

[4]Which doctrine involved the dismissal of a case if the forum chosen by the plaintiff was "so completely inappropriate and inconvenient that it [was] better to stop the litigation in the place where brought and let it start all over again somewhere else." *Norwood,* 349 U.S. at 31.

6

> consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum."

*Id.* (citation omitted). The Court then describes some of the "many variants of the private and public interests protected by the language of § 1404(a)." *Id.*

> The private interests have included: plaintiff's forum of preference as manifested in the original choice . . .; whether the claim arose elsewhere . . .; the convenience of the parties as indicated by their relative physical and financial condition . . .; the convenience of the witnesses - **but only to the extent that the witnesses may actually be unavailable for trial in one of the fora** . . .; and the location of books and records (**similarly limited to the extent that the files could not be produced in the alternative forum**) .
> . . .
>
> The public interests have included: the enforceability of the judgment . . .; practical considerations that could make the trial easy, expeditious, or inexpensive . . .; the relative administrative difficulty in the two fora resulting from court congestion . . .; the local interest in deciding local controversies at home . . .; the public policies of the fora . . .; and the familiarity of the trial judge with the applicable state law in diversity cases. . . .

*Id.* (citations omitted) (emphasis added).

*Jumara*, of course, was not a patent case and was decided almost two decades ago. It does not take an intellectual leap of faith to suggest that, when the Third Circuit identified the factors discussed above, the Court did not necessarily have in mind the kind of business disputes that are characteristic of today's patent litigation, that is, where the parties are national and international companies competing aggressively for market share with the will, sophistication and resources dedicated to resolving their

business disputes in court. Neither did the Third Circuit have in mind the fact that Congress itself has legitimized "forum shopping" by enacting the "Patent Cases Pilot Program," Pub. L. No. 111-349, 124 Stat. 3674, thus eliminating the stigma once associated with that phrase and the notion that plaintiffs, by choosing a forum in the first instance, were engaged in some nefarious conduct.

In addition to the above factors, the court must take into consideration the "general rule" that "favors the forum of the first-filed action" unless there is "sound reason that would make it unjust or inefficient to continue the first-filed action." *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937-38 (Fed. Cir. 1993), *overruled on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). "The first-filed rule encourages sound judicial administration and promotes comity among federal courts of equal rank. It gives a court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *E.E.O.C. v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988). In this regard, however, "courts have consistently recognized that the first-filed rule 'is not a rigid or inflexible rule to be mechanically applied.'" *Id.* at 976 (citation omitted). Factors that have been regarded as proper bases for departing from the first-filed rule include bad faith, forum shopping, when the second-filed action has "developed further than the initial suit," and "when the first-filing party instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable, forum." *Id.* (citations omitted). "The letter and spirit of the first-filed rule, therefore, are grounded on equitable principles," and in exercising its discretion, a district court "must act 'with regard to what is right and equitable under the circumstances and the law, and directed

by the reason and conscience of the judge to a just result.'" *Id.* at 977 (citing *Langnes v. Green*, 282 U.S. 531, 541 (1902)).

## IV. ANALYSIS

### A. Transfer Pursuant to § 1404(a)

With the above "jurisdictional guideposts" in mind, the court turns to the "difficult issue of federal comity" that these motions present. *E.E.O.C. v. Univ. of Pa.*, 850 F.2d at 976. Although transfer is a discretionary decision on the part of a district judge, clearly the Federal Circuit expects an analysis of all the *Jumara* factors in connection with any transfer decision issued by this court.[5]

#### 1. Plaintiff's choice of forum

As noted above, Cellectis filed suit in Delaware for legitimate reasons. Precision is a Delaware corporation and does not deny in its papers that its products are sold on a national basis. (D.I. 13 at 16) Although Cellectis is a foreign corporation with no particular relationship to any domestic locale, the court declines to disregard the privilege of choosing a venue that has historically been accorded plaintiffs.

This factor weighs against transfer.

#### 2. Where the claims arise

Precision argues that Delaware has "no connection to the operative facts of this litigation," presumably with respect to whether the patent claims at issue arose elsewhere. Precision goes on to argue that, because "[t]he research, development,

---

[5]Given that there already is pending in the Eastern District of North Carolina a mirror-image lawsuit (*North Carolina II*), there is no need to address the requirement under § 1404(a) that the transfer be to a district where the civil action could have been brought.

design, and manufacture of [its] allegedly infringing endonucleases took place in North Carolina," and because "none of the activities leading to the issuance of the ['372 patent] occurred in Delaware" (*id.*), transfer to North Carolina is warranted.

That may be so but, as a matter of law, a claim for patent infringement arises wherever someone has committed acts of infringement, to wit, "makes, uses, offers to sell, or sells any patented invention" without authority. 35 U.S.C. § 271(a). *See Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1360 (Fed. Cir. 1998) (an infringement claim "arises out of instances of making, using, or selling the patented invention."). If Precision offers to sell or sells any of its allegedly infringing products in Delaware (and there is no indication of record to the contrary), the patent claims at issue can be said to have arisen in Delaware.

This factor weighs against transfer.

### 3. The convenience of the parties

The Third Circuit in *Jumara* indicated that, in evaluating the convenience of the parties, a district court should focus on the parties' relative physical and financial condition. In this case, Precision has characterized itself as "a very small, local company" that maintains "its one and only facility in North Carolina." (D.I. 13 at 18) Although neither party provided specific figures to aid the court's analysis, there is no real dispute that Cellectis is a larger company in terms of both its physical and financial condition.

This factor weighs in favor of transfer.

### 4. The convenience of the witnesses

10

As the Third Circuit in *Jumara* implicitly recognized, litigation is an inconvenient exercise. Therefore, it is not whether witnesses are inconvenienced by litigation but, rather, whether witnesses "actually may be unavailable for trial in one of the fora" that is a determinative factor in the transfer analysis. *Jumara*, 55 F.3d at 879. Precision has argued in this regard that each of its 15 employees lives and works in North Carolina and, consequently, "[t]he disruption of Precision's business activities should they have to appear for trial, hearings, or other proceedings would be significantly less if these matters were to proceed in the Eastern District of North Carolina." (*Id.* at 18)

It is safe to say that North Carolina is a more convenient forum than Delaware for Precision. It should be noted in this regard, however, that "none of the numerous depositions in [*North Carolina I*] took place in North Carolina" but, rather, in Boston or New York. (D.I. 23 at 18) Indeed, Precision does not argue that its witnesses would not be available for proceedings in Delaware or that its business activities would be substantially disrupted if litigation were to proceed in Delaware.[6]

This factor is neutral.

### 5. Location of books and records

The Third Circuit in *Jumara* again advised that, while the location of books and records is a private interest that should be evaluated, it is not a determinative factor unless "the files c[an] not be produced in the alternative forum." *Jumara*, 55 F.3d at

---

[6]Depositions in the cases over which this judicial officer presides are generally taken where the deponents reside or work. With respect to trials, in the nine patent jury trials conducted by this judicial officer between March 2010 and October 2011, an average of three fact witnesses per party appeared live for trial, with the average length of trial being 28 hours (with the parties often using less time than allocated, on average, 25 hours).

879. Precision argues that it "maintains all technical and business documentation regarding the accused endonucleases at its North Carolina headquarters" (D.I. 13 at 22), a representation consistent with Precision's solitary location in North Carolina.

Consistent, however, with the court's view that virtually all businesses (especially those based on advances in technology) maintain their books and records in electronic format readily available for review and use at any location, Precision produced all of its documents in *North Carolina I* via CD from either Boston or New York; Cellectis produced all of its documents via CD from France. No documents were open to inspection in North Carolina. (D.I. 23 at 22; no response to these facts in D.I. 29) With respect to trial, the court notes that, in the nine patent jury trials over which this judicial officer presided between March 2010 and October 2011, an average of 87 documents were admitted per trial as exhibits by all parties, hardly a burden.

This factor is neutral.

### 6. Enforceability of the judgment

The parties agree that this factor is neutral. (D.I. 13 at 25; D.I. 23 at 25)

### 7. Practical considerations that could make the trial easy, expeditious, or inexpensive

This factor arguably is where the "difficult issues of federal comity" most dramatically come into play, as it involves a comparison between courts of equal rank to determine their efficiencies, all in the context of the parties' various business and litigation strategies. The court in Delaware has been criticized for managing its patent docket without the aid of local rules, allowing the judges to vary their case management procedures over time and/or from case to case. The court has also been criticized for

embracing its work as a trial court – encouraging parties to settle their disputes, but not shying away from resolving disputes through the adversarial process (including trial) if the parties fail in their efforts to craft a business solution. The court has most specifically been criticized for expecting the corporate citizens of Delaware to make themselves available to litigate in Delaware, as has been their historical obligation, and for making observations about the realities of patent litigation gleaned from the (not insubstantial) experience of its judges.

Having thus set the stage, the court recognizes that trial in North Carolina would be easier and less expensive for Precision, while trial in either Delaware or North Carolina is more probably a wash for Cellectis, a foreign company. The court also recognizes that the judge in North Carolina has been exposed to the technology at issue, although has made no substantive decisions in this regard and has not been involved in *North Carolina I* since August 2010.

The question that remains is whether trial would be more, or less, expeditious if the case were transferred. As described above, Precision has responded to Cellectis' patent infringement suits with an administrative counter-punch, that is, requests for *inter partes* reexamination. Litigation in *North Carolina I* has been stayed since August 2010 pending reexamination of the '545 and '605 patents. Precision has filed a motion to stay the instant litigation pending reexamination of the '372 patent, a process initiated by Precision after Cellectis filed suit. (D.I. 41) The court has not yet addressed the motion to stay, but observes that the strategy of responding to litigation by pursuing reexamination is simply another example of forum-shopping, perfectly legitimate but, nonetheless, a way to postpone a patent holder's day in court.

13

This factor weigh in favor of transfer.

### 8. Relative administrative difficulty

The issue of court congestion seems unimportant under the facts at bar, when *North Carolina I* has been stayed for approximately 20 months. Although trial on the '372 patent is scheduled to commence in February 2013, there is a pending motion to stay that has not yet been resolved. At this point in time, the factor is neutral.

### 9. Local interest in deciding local controversies

Precision reiterates its arguments relating to its being a local North Carolina company and, relative to many parties involved in patent litigation, it is more a regional company, with its physical business operations and employees located exclusively in North Carolina. The court recognizes as well that the North Carolina economy may be impacted by litigation, e.g., the local economy derives benefits when trial attracts visitors and/or is resolved in favor of the local company.

Nevertheless, and despite the implications to the contrary,[7] patent litigation does not constitute a local controversy in most cases. Patent cases implicate constitutionally protected property rights. The resolution of patent cases is governed by federal law reviewed by a court of appeals of national (as opposed to regional) stature. Moreover, to characterize patent litigation as "local" undermines the appearance of neutrality that federal courts were established to provide (especially to foreign litigants like Cellectis) and flies in the face of the national (if not global) markets that are affected by the

---

[7]*See, e.g., Link_A_Media*, 662 F.3d at 1224 (in discussing *Jumara's* public interest factors, the Court emphasized that the forum should have "ties" to the dispute or to the parties aside from being the state of incorporation).

outcomes of these cases.

This factor is neutral.

### 10. Public policies of the fora

Both parties agree that this factor is neutral. (D.I. 13 at 25; D.I. 23 at 25)

### 11. Familiarity of judge with state law

The court agrees with Precision that the fact that Cellectis amended its complaint (after the motion to transfer was filed) to add claims under 6 Del. C. § 2532 and the common law of Delaware for unfair competition, does not make a difference in the transfer analysis under *Jumara*. The Third Circuit in *Jumara* specifically limited this factor to "applicable state law in diversity cases," 55 F.3d at 879, and these newly added state law claims clearly are secondary to the claims for patent infringement.

This factor is neutral.

### 12. Conclusion

Precision has the burden of persuading the court, by a preponderance of the evidence, that the *Jumara* factors (as analyzed in light of the record presented by the parties) warrant transfer. Two factors weigh against transfer - plaintiff's choice of forum and where the claims arise. Two factors weigh in favor of transfer - the convenience of the parties evaluated in terms of (1) their resources and (2) the burdens associated with trial in either fora. Without giving undue weight to any one factor,[8] Precision has not tipped the scales of justice toward its side. Its motion to transfer (D.I. 16) is denied.

---

[8]The court declines at this juncture to assign greater weight to the fugacious criterion of convenience than to, e.g., the historic privilege accorded plaintiffs in choosing their forum.

15

## B. First-Filed Rule

Having concluded that Delaware is an appropriate forum in which to try the instant case, the court turns to the motion filed by Cellectis to enjoin *North Carolina II* under the principles of the first-filed rule. There is no question but that the instant suit was filed prior to *North Carolina II*. Although Precision argues that *North Carolina I* is really the first-filed case because it involves the same parties and the same technology, clearly the first-filed rule was meant only to address the mirror-image litigation filed by Precision in *North Carolina II*, the latter also involving the '372 patent. *See Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 930 (3d Cir. 1941) ("It is of obvious importance to all the litigants to have a single determination of their controversy, rather than several decisions which, if they conflict, may require separate appeals to different circuit courts of appeals."). The fact that the district court in North Carolina has become acquainted with the '545 and '605 patents and the underlying technology through *North Carolina I* has no bearing on the ultimate determination of the controversy over the '372 patent.[9] Therefore, neither *North Carolina I* nor *North Carolina II* may be considered the first-filed case vis-a-vis the '372 patent.

The determination that the instant litigation is the first filed, however, does not necessarily end the inquiry. The question remains as to whether any of the exceptions to the first-filed rule apply. In this regard, aside from its argument that the related

---

[9] It is asserted by Cellectis that the '545 and '605 patents, at issue in *North Carolina I*, recite methods of using endonucleases to induce at least one site directed double-stranded break in the DNA of an organism, while the '372 patent relates to certain engineered 1-Crel meganucleases themselves, and specifies amino acid mutations in those meganucleases. (D.I. 23 at 5)

16

litigation in *North Carolina I* constitutes the first-filed suit, Precision contends that the instant litigation should be transferred to North Carolina under the § 1404(a) paradigm, as opposed to addressing the exceptions to the first-filed rule. Under these circumstances, the court will review Precision's arguments as they impliedly relate to the exceptions to the first-filed rule.

Precision accuses Cellectis of forum shopping and, by implication, of bad faith in its selection of Delaware as the forum of choice to litigate the '372 patent. (D.I. 13 at 2) As noted above, given an appropriate venue in the first instance and Congress' blessings for choosing venues based, *inter alia*, on a court's pretrial management procedures, the court declines to characterize a patentee's choice of venue as "forum shopping" when, by moving to transfer venue, a defendant is doing the same thing – choosing a venue that it believes to be more favorable to its claims for whatever reason.

In terms of bad faith, Precision implies through its arguments that, having chosen North Carolina as the forum in which to litigate the '545 and '605 patents, Cellectis is bound to file all its subsequent litigation against Precision in North Carolina. To the extent Precision is arguing that a company should not oppose litigating in a court in which it previously litigated without complaint, the court agrees. However, to suggest that a company that chooses different venues for different suits is operating in bad faith is disingenuous, and the suggestion is a not-so-subtle attempt to cloak the venue selection exercise in which every company engages with overtones of intentional misconduct. There is nothing of record to indicate bad faith on the part of Cellectis when it chose to initiate suit in Delaware. Therefore, the first two exceptions to the first-filed rule are inapplicable.

Neither are the latter two exceptions applicable. The instant litigation has proceeded apace, with fact discovery completed and a trial date scheduled. With respect to whether Cellectis could be characterized as having filed an anticipatory suit, it is difficult to believe that a patent holder's suit for patent infringement could ever be deemed "anticipatory" to a declaratory judgment suit filed by the accused infringer.

## IV. CONCLUSION

For the reasons stated above, Cellectis' motion to enjoin (D.I. 7) is granted and Precision's motion to transfer (D.I. 16) is denied.

An appropriate order shall issue.